**FREEDOM SAVINGS AND LOAN ASSOCIATION, etc., Plaintiff,**

v.

**Vernon WAY, Jr., d/b/a Freedom Realty, Defendant/Counterclaim Plaintiff,**

v.

**FREEDOM SAVINGS AND LOAN ASSOCIATION, etc., Counterclaim/Defendant.**

**No. 82–887 Civ–T–WC.**

United States District Court, M.D. Florida, Tampa Division.

April 10, 1984.

Rick B. Levinson, Nancy G. Farage, Levine, Freedman, Hirsch & Levinson, P.A., Tampa, Fla., for plaintiff.

John S. Hale, Gipple & Hale, McLean, Va., G. Donavon Conwell, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, Fla., for defendant.

## OPINION

CASTAGNA, District Judge.

After a three day trial, the parties have submitted post-trial memoranda and proposed findings. Based on the evidence and testimony produced at trial and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

### 1) *Historical Background of the Dispute*

Plaintiff Freedom Savings and Loan Association ("Freedom Savings") is a full service financial institution which has existed under various names since 1930. Freedom Savings is currently a corporation organized under the laws of Florida and has its main place of business in Tampa. It offers a full range of financial services throughout Florida and other parts of the nation.

In 1974, Freedom Savings was known as First Federal of Tampa. During a period of expansion, this earlier incarnation of Freedom Savings had acquired several other savings and loan associations in Florida. Because these purchases expanded operations, Freedom's predecessor decided to remove the geographic designation from its name. Upon recommendation from an advertising agency, the savings and loan promoted a public contest to select a new name more appropriate for a wide ranging enterprise. This advertising agency reviewed all names submitted during the contest, and eliminated those having any reference to place names or fauna. In consideration, "of the public's apparent deep appreciation of God and country," the advertising firm recommended that the Board of Directors change the name to Freedom Savings and Loan.

After October, 1974 plaintiff embarked on an extensive advertising and promotional program to inform the public of its new name. In conjunction with the promotion campaign, plaintiff registered the mark "Freedom" as a trade and service mark.[1] Since changing its name and obtaining federal registration on its various marks, plaintiff has spent considerable sums of money in presenting the name "Freedom" to the general public. As it had since its inception, plaintiff continued to provide financial services in the Tampa area, including Hillsborough, Pinellas and surrounding counties.

Around November of 1976, Defendant Vernon Way, Jr. opened his real estate brokerage in Hillsborough County under the name Freedom Realty. Although Mr. Way knew of Freedom Savings and Loan Association when he selected the name for his realty service, he felt he could use the word "Freedom" because the savings and loan was not in the real estate business. He described his reasons for naming the brokerage. "We were in the bicentennial year, Mr. Levinson, and my thoughts ran towards America, the flag, our country, and one of the freedoms of this country is owning your own home. And the word realty means real estate. I chose the name Freedom Realty." At almost the same time that plaintiff was applying for some of its federal service marks, defendant was complying with Florida laws for registering Freedom Realty as a fictitious trade name.[2]

---

1. Plaintiff obtained registration for the mark "Freedom Federal" and its accompanying logo for its "Freedom Card," "Freedom Account," "Freedom Machine," "Freedom Mortgage," "Freedom Planner" and other marks relating to its savings and loan operations. The first registrations occurred in November of 1975 while others were registered as late as June of 1981.

2. Defendant began publishing notices in accordance with *Fla.Stat.* § 865.09 on November 12, 1976. Until that date, plaintiff had obtained registration of "Freedom Federal and Design," its "Freedom Card" and design, the mark "Freedom Federal" and a mark for the "Freedom Account." It was not until December 7, 1976 that plaintiff applied for registration of the mark "Freedom" standing alone. This mark for

While on a smaller scale, defendant, like plaintiff, has expended considerable sums of money in advertising his business name.

Shortly after opening for business, plaintiff's representatives approached defendant almost daily attempting to solicit business from his real estate customers. Like many financial institutions, plaintiff wanted real estate agents and brokers to refer potential borrowers to Freedom Federal. One of the Freedom Federal employees who visited defendant's offices in the beginning was Rudy Canady. He and other Freedom Federal employees continued to solicit business from defendant and would periodically distribute promotional items such as cups or pens. The direct contact between defendant and plaintiff continued in 1979 when Mr. Way purchased the Tampa office in which his business is currently located. In buying the office, defendant had to assume a mortgage loan held by plaintiff, Freedom Federal. The loan officer verified that the assumption was in the name of Freedom Realty, and that mortgage assumption was still in effect as of the date of the trial in this case.

While defendant's real estate business was growing, plaintiff went through more changes. In May of 1980, Freedom Savings changed from federal to state regulation. This change allowed plaintiff to expand into a large number of areas which had been prohibited under laws regulating federally chartered banks. After becoming a state regulated institution, plaintiff purchased a mortgage title company, an investment firm and also bought all of the stock in a real estate brokerage. That brokerage, currently called Sun Bay Realty, Inc. was a desirable addition to plaintiff's growing stable of organizations related to the flagship savings and loan.[3] During the period that defendant's business was growing and plaintiff's employees continued their solicitations, plaintiff never

complained of defendant's use of the word "Freedom." Defendant continued contact with plaintiff and its newly purchased subsidiaries, and even sold houses in conjunction with plaintiff's subsidary, Sun Bay Realty. When defendant attempted to obtain federal registration for the name Freedom Realty, plaintiff objected to the application. A hearing was held before the Trademark Trials and Appeals Board (TTAB) on December 6, 1980. Prior to this hearing, plaintiff never directly objected to defendant's use of the name Freedom Realty. While the case was pending before the TTAB, a member of plaintiff's legal office paid a visit to defendant. That representative, Robert Grotke, asked if defendant would sell his office, the rights to the name Freedom Realty, the rights to the Freedom Eagle associated with defendant's name or a sale of everything defendant had pertaining to the word Freedom. Mr. Grotke stated that he was simply trying to get a "feel" for defendant's position and asked if Mr. Way would be willing to meet other Freedom Savings officials at their headquarters. Although defendant Way agreed to come downtown, he heard no more from plaintiff. Shortly after the visit from Grotke, the TTAB issued its decision denying defendant's application to register the mark "Freedom Realty." *Freedom Savings and Loan Association v. Way*, 217 U.S.P.Q. 971 (T.T.A.B.1981). Following the usual cease and desist letter, this suit was filed for infringement, unfair trade practices and dilution of a registered mark.

## 2) *Comparison of the Parties Business and Marks*

Plaintiff and defendant both use the word "Freedom" prominently within their business names. Plaintiff often uses its logo in association with the word "Freedom." That logo is a red, banner-like emblem which plaintiff uses with and without the word "Freedom." Defendant, on the

---

just the word "Freedom" was not officially registered until January 2, 1979.

**3.** Plaintiff's president and chief executive officer testified that before becoming a state regulated institution, he had considered purchasing a real

estate brokerage. Serious consideration of expanding into this business did not occur until after plaintiff became aware of all its new options under the state laws.

other hand, uses the word "Freedom" only in conjunction with the word "Realty." [4] Defendant's name is often accompanied by an eagle and crest design. The Court finds that from a mere visual examination, the two marks are not confusing.

Both parties use their respective names, logos, marks and designs in the same geographic location. While plaintiff's operations are more extensive, defendant engages in business solely in Hillsborough and adjacent counties in central Florida. Within this area of common operations, several other businesses use the word "freedom" in their name.[5] One of these other businesses is Freedom Realty of Pinellas, Inc. which has been in operation since November 17, 1980. Plaintiff has never complained about this use of the word "Freedom" even though Freedom Realty of Pinellas also refers customers to plaintiff.

Until it purchased Sun Bay Realty, Inc. in 1981, plaintiff did not engage in the real estate brokerage business. As a savings and loan institution, it did have substantial contact with real estate financing, closings, appraisals, foreclosures and other matters related to real estate transactions. Plaintiff also invested in real estate and rented some properties it had built or purchased. Defendant, on the other hand, engages in the activity most commonly associated with a real estate broker, matching a willing seller with prospective purchasers for a fee. In 1980, plaintiff's vice-president for specialized lending concluded that there was no overlap between the services provided by plaintiff and services provided by a real estate brokerage. The Court finds that until plaintiff bought Sun Bay Realty, it did not compete with or provide the same services as defendant, even though both parties operated in the same geographic area.

It is clear that many customers use both plaintiff and defendant's services. This is true both before and after plaintiff acquired its own real estate brokerage. While the customers are the same, the facilities in which plaintiff and defendant provide their services are markedly different. Most of plaintiff's offices are financial institutions, replete with tellers and cashiers in a modern atmosphere. Defendant, on the other hand, operates his real estate brokerage and school from an older home which has been converted to office use. Although they operate from different physical settings, plaintiff and defendant use similar means in attracting customers. Both advertise in local newspapers, on radio and by use of printed signs.

The Court finds that defendant Vernon Way, Jr. did not intend to capitalize on plaintiff's reputation when he selected his business name in 1976. Instead, he thought he could use the word "Freedom" because he was in a different business than the savings and loan institution. The Court finds that there is no credible evidence of actual confusion amongst plaintiff's customers. Defendant showed that no person involved in the day-to-day operation of real estate brokering, financing or title servicing had heard of a single instance of customer confusion. Plaintiff presented two discrete pieces of evidence purportedly showing actual confusion. Plaintiff's president stated that some of his friends had asked if defendant's real estate business belonged to plaintiff. These reports were never substantiated, nor was there any showing that these "friends" were potential customers confused by the similar names. As a second attempt at proving actual confusion, plaintiff introduced portions of Rudy Canady's deposition. Canady testified at deposition that he called on many real estate companies in the course of his duties for Freedom Savings. During one such call to defendant's office, Canady claimed that defendant Way said that a potential lister thought Freedom

---

**4.** Since some time in 1981, defendant has operated under the name "Vernon Way's Freedom Realty, Independently Owned and Operated."

**5.** Plaintiff's president indicated that they had concluded litigation with an entity known as Freedom Financial Services, a subsidiary of Mellon Banks.

Savings and Freedom Realty were related. Vernon Way emphatically denied he ever made that statement. He testified that he had a poor relationship with Canady, and had eventually thrown him out of the office for making advances on the Freedom Realty secretary. In light of this altercation, the Court's ability to assess Mr. Way's credibility and the fact that Canady's credibility could not be assessed, this is not enough credible evidence to show actual confusion.

In summary, the Court finds that plaintiff and defendant co-existed for at least three years, if not longer, both parties using the word "Freedom" in their business names. Plaintiff had registered the word "Freedom" in conjunction with its savings and loan operations by the time defendant opened his business. However, plaintiff did not have a registered mark in the word "Freedom" itself until 1979. Despite constant contact with and knowledge of defendant's business, plaintiff was apparently unconcerned about defendant until he tried to register the mark "Freedom Realty." Even after defendant attempted to register his mark, plaintiff did not try to prevent any supposed infringement of its mark until after defendant had refused to sell his real estate business or his rights in the name Freedom Realty.

## CONCLUSIONS OF LAW

Plaintiff filed this suit seeking relief under three distinct legal theories. It complained of infringement of services and trade marks, under 15 U.S.C. §§ 1116, 1117 and 1118. Plaintiff also alleged that defendant engaged in unfair competition under 15 U.S.C. § 1125(a). Third, plaintiff brought a pendant state claim for dilution of its service mark under Fla.Stat. § 495.-151. Defendant counterclaimed, asking for a declaratory judgment granting him a common law right to the name Freedom Realty, requesting a permanent injunction enjoining plaintiff from doing business as Freedom Realty, and praying for damages and attorneys fees. The Court has jurisdiction to hear these claims and counterclaims under 28 U.S.C. §§ 1338, 1391 and the doctrine of pendant jurisdiction.

### 1) *Plaintiff's Infringement Claim*

The essential question in resolving this claim is whether there is a "likelihood of confusion" concerning the identity or association between plaintiff and defendant due to their common use of the word "Freedom." 15 U.S.C. § 1114(1); *Sun Banks of Florida v. Sun Federal Savings & Loan,* 651 F.2d 311, 314 (5th Cir.1981). After visiting this key issue, the Court must decide if the doctrine of "expansion" has relevance to this case, and whether plaintiff's claim is barred by laches.

■■ a) *Likelihood of Confusion.* It is well settled that the following seven factors must be assessed to determine whether there is a likelihood of confusion between plaintiff's and defendant's use of the word "Freedom"; the similarity of design, similarity of the product, the type of mark at issue, identity of customers, similarity of advertising media, defendant's intent and actual confusion. *Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540 (11th Cir. 1984); *Safeway Stores, Inc. v. Safeway Discount Drugs,* 675 F.2d 1160, 1164 (11th Cir.1982); *Roto-Rooter Corporation v. O'Neal,* 513 F.2d 44 (5th Cir.1975). While plaintiff's marks are presumed to be valid under the Lanham Act, this presumption is immaterial to the determination of likelihood of confusion. *Citibank, N.A. v. Citibanc Group, Inc., supra; American Foods, Inc. v. Golden Flake, Inc.,* 312 F.2d 619 (5th Cir.1963).

*Similarity of Design*—Use of a common word in two different marks does not automatically dictate a conclusion that the two entities are connected. *Sun Banks, supra,* at 317. Instead of individual features, the Court must look to the total effect of the design. *Id. Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 260–61 (5th Cir. 1980) *cert. denied* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). As explained in the findings of fact above, nothing is similar between plaintiff's and defendant's designations except the word "Freedom." The

accompanying design, logo and lettering of the word "Freedom" all suggest no connection. Furthermore, defendant uses the word "Realty" at all times in his advertising.[6]

*Similarity of Product*—Until it became a state regulated thrift institution in 1980, plaintiff engaged solely in financial activities associated with its savings and loan operations. Since becoming a state institution, plaintiff has branched out into real estate investments, financing, leasing, construction and title insurance under the name "Freedom." While it now engages in real estate brokerage services, it does so under the name Sun Bay Realty, a name associated with at least two other major financial institutions in Florida. See, *Sun Banks, supra.* Until 1980, plaintiff and defendant most definitely did not offer the same services to the public, even though their operations were complementary to each other. Since plaintiff acquired Sun Bay Realty, there still is no similarity of services between defendant's business and plaintiff's operations done under the word "Freedom." Only defendant is licensed to operate a real estate brokerage using the word "Freedom."

*Type of Mark*—The courts and commentators have erected classifications for trade and service marks which, while well defined, are often difficult to apply. *See Citibank, N.A. v. Citibanc Group, Inc., supra* (Vance, J. dissenting); *Vision Center v. Opticks, Inc.* 596 F.2d 111, 115 (5th Cir.1979) *cert. denied* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980). There are four basic categories: (1) Arbitrary and fanciful terms such as "Kodak" bear no relationship to the product or service with which they are related. These marks are given the widest ambit of protection, (2) Descriptive marks identify a characteristic or quality of an article or service, for example, its color, odor, functions, dimensions or ingredients. These descriptive marks are

protected if they have acquired a secondary meaning, (3) Suggestive terms do not actually describe characteristics of goods or services. Instead, these items only hint at the characteristics of the goods or services, and require the consumer to exercise his or her imagination as to the nature of the product or service. An example of a suggestive term is the word Penguin when used as a mark for refrigerators. Suggestive marks are protected without any proof of secondary meaning, (4) Generic terms refer to a particular class of goods or services of which the individual article or service is but a member. A generic term such as "butter" can never become a trademark. *See generally Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1183–4 (5th Cir.1980).

Plaintiff contends that the term "Freedom" is a mark that comes within the arbitrary and fanciful category. As such, it would be called a "strong" mark, and thereby widely protected. *See Amstar Corp. v. Dominos Pizza, Inc.,* 615 F.2d 252, 259 (5th Cir.1980). However, the term "Freedom" is not a coined or fanciful word, such as "Exxon" or "Kodak." *Id.* The evidence revealed that this term was not chosen in an arbitrary fashion. Instead, plaintiff's Board of Directors selected their new name after being told that the term "Freedom" reflected the public's deep appreciation for this Nation and the rights for which it stands. The Court concludes that plaintiff's mark was suggestive and therefore entitled to relatively weak protection. *Sun Bank, supra* at 315.[7]

*Identity of Customers*—As noted in the findings of fact, at plaintiff's suggestion defendant steered many real estate clients to Freedom Savings for financing. Other than this symbiotic relationship, there is no indication that any customers of a business using the name Freedom in plaintiff's organization also use defendant's real estate brokerage.

---

**6.** The proof at trial showed that defendant also operates a school for training real estate personnel called the Freedom Academy. The complaint does not take issue with this use of the word "Freedom."

**7.** Because the mark is suggestive, there is no need to determine secondary meaning.

*Similarity of Advertising Media*—While plaintiff's advertising is much more substantial and in larger-circulation papers, both parties advertise their services in similar media of communication. However, defendant does advertise in ways different than plaintiff, using a small newsletter, making personal contacts and leaving handouts and flyers at shopping centers. On the whole, there is only a slight similarity when comparing the parties advertising campaigns. *See Exxon Corporation v. Texas Motor Exchange of Houston,* 628 F.2d 500, 506 (5th Cir.1980).

■ *Defendant's Intent*—Bad faith use of a protected mark by itself "may be sufficient to justify the inference that there is confusing similarity." *Amstar Corporation, Inc. v. Domino's Pizza, Inc., supra* at 263 *quoting* Restatement of Torts § 729, comment (f) (1938). If a defendant uses methods in an attempt to "pass off" his goods as those of plaintiff's, courts will usually find bad faith. *Id., Kentucky Fried Chicken Corporation v. Diversified Packaging Corporation,* 549 F.2d 368, 382–83 (5th Cir.1977). Plaintiff presented no such evidence of bad faith. On the contrary, when defendant became aware that plaintiff was challenging his use of the word "Freedom" he changed his name to further distinguish it from plaintiff's mark.

*Actual Confusion*—As stated above, the Court finds no credible evidence of actual confusion. While such a finding does not necessarily preclude a conclusion that confusion was likely, actual confusion is nevertheless the best evidence a plaintiff can present. *Roto-Rooter Corporation v. O'Neal, supra* at 46. The evidence at trial showed that both customers and persons working in real estate, title, mortgage financing and associated businesses were not confused by the fact that both plaintiff and defendant used the word "Freedom."

■ After a serial review of the relevant legal criteria, the Court concludes as a matter of fact and law that there is no likelihood of confusion between plaintiff's registered marks and defendant's business name.[8] Therefore, plaintiff cannot prevail on its infringement claim.

■ b) *Doctrine of Expansion.* When a trade or service mark owner shows an intention to expand into other geographic areas, the protection of the Lanham Act runs to those areas as well. *See American Foods, Inc. v. Golden Flake, Inc.,* 312 F.2d 619, 626 (5th Cir.1963); *Dawn Donut Company v. Hart's Food Stores,* 267 F.2d 358 (2d Cir.1959). This expansion doctrine allows growth not only in new geographic areas, but also allows extension of a mark to new wares which may be the natural outgrowth of the trade-mark products. *Artcraft Novelties v. Baxter Lane Company of Amarillo,* 685 F.2d 988, 990 (5th Cir.1982) *citing Stardust, Inc. v. Weiss,* 79 F.Supp. 274, 278 (S.D.N.Y.1948). This principle does not help plaintiff in this case. First, it is defendant and not plaintiff who first used the word "Freedom" in conjunction with a real estate brokerage. Second, plaintiff was not able to expand into this area before it became a state thrift institution in May of 1980. Therefore, this was not a "natural area of expansion" for most of the time plaintiff owned its registered marks. Finally, plaintiff cannot rely on the expansion doctrine because defendant has long since occupied this area without objection from Freedom Savings. Even if plaintiff could have expanded into the real estate business, "it was bound to protect it against invaders by affirmative action; it could not impose upon [defendant] the duty

---

8. The TTAB came to the opposite conclusion on this issue. The decision of that tribunal was not admitted during plaintiff's case in chief because it would have been overly prejudicial. Since the case was converted to a bench trial after the close of plaintiff's presentation, it could have been admitted into evidence. Nevertheless, the Court abides by its ruling in denying plaintiff's motion for summary judgment. The TTAB decision is "entitled to the most respectful consideration," but does not collaterally estop relitigation of this issue. *Carling Brewing Co., Inc. v. Philip Morris, Inc.,* 277 F.Supp. 326, 333 (N.D. Ga.1967). While the Court has considered the TTAB's decision, it is still unpersuaded that there is a likelihood of confusion, especially when measured by the seven criteria used in this Circuit.

of divining its own purpose or possible mistake of the public." *Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corp.*, 105 F.2d 908, 911 (2d Cir.1939) *cert. denied* 308 U.S. 616, 60 S.Ct. 262, 84 L.Ed. 515 (1939) (Learned Hand, J.). Not until it contemplated a network of organizations under the Freedom Savings umbrella did plaintiff ever take any "affirmative action" to protect its mark. It had no right of expansion into the real estate brokerage business under the name "Freedom."

■ c) *Laches*—Even if there is a likelihood of confusion between plaintiff's and defendant's use of the word "Freedom," and even if the expansion doctrine applied, the Court concludes that plaintiff is barred by the doctrine of laches from pressing its infringement claim. To prevail under this rule of equity in a service and trademark infringement action, a defendant must show, (1) a delay in asserting a right or claim; (2) that the delay was not excusable; (3) and that the delay caused undue prejudice. *Citibank N.A. v. Citibanc Group, Inc., supra.*

■ In applying this flexible doctrine, the Court must examine both the amount of delay and the prejudice caused by that delay. *Id.* Plaintiff knew of defendant's business from the day defendant opened, yet did nothing until defendant filed an application to register the name Freedom Realty. Even after it opposed defendant's application, plaintiff did not write a cease and desist letter until August of 1981, almost five years after the time that it knew defendant was operating under the name Freedom Realty. Plaintiff has shown no reason why this long period of acquiescence should be excused. Furthermore, defendant has expended considerable time, effort and money in promoting his business

and his name. He is greatly prejudiced by the fact that plaintiff slept on its rights for almost five years. Therefore plaintiff's claims are barred by laches.[9]

### 2) *Plaintiff's Unfair Competition Claim*

■ Plaintiff's second claim is based on 15 U.S.C. § 1125(a). This section of the Lanham Act created a distinct statutory tort designed to afford a broad protection against various forms of unfair competition and false advertising. *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1376 (D.N.J.1981) (cites omitted). Unfair competition is a broader area of the law than trade or service mark infringement. *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.*, 510 F.2d 1004, 1010 (5th Cir.1975); *Quabaug Rubber v. Bariano Shoe Inc.*, 557 F.2d 154 (1st Cir.1977); 1 J.T. McCarthy, *Trademarks and Unfair Competition*, § 2:2 at 45 (1973) (cites omitted). In other words, infringement of a registered mark is but a subset of those things proscribed by the unfair competition cause of action provided in § 1125(a).

The central inquiry in this claim is whether defendant is passing off his services as those of plaintiff by virtue of "substantial similarity" between the two, leading to confusion on the part of potential customers. *Sun-Fun Products v. Suntan Research & Development*, 656 F.2d 186, 192 (5th Cir. 1981). While the factors governing this inquiry are essentially the same as those relevant to determining trademark infringement, the scope is much broader. *Id.*

Even under this broader inquiry, the Court still concludes that there is no "substantial similarity" between plaintiff's and defendant's presentations to the public.

9. Plaintiff contends that the doctrine of laches is inapplicable here, since its damage claims were eliminated before presentation of defendant's case, citing *Country Properties, Inc. v. Bill's Country Kitchen, et al.*, 204 U.S.P.Q. 548 (M.D. Fla.1979). However, plaintiff here seeks injunctive relief to prevent defendant from using the word "Freedom" in conjunction with his business. As stated by the Fifth Circuit "One basic principle has, however, been consistently followed: equitable remedies are not available if granting the remedy would be inequitable to the defendant because of plaintiff's long delay." *Environmental Defense Fund v. Alexander*, 614 F.2d 474 at 478 (5th Cir.1980). Therefore, plaintiff's request for the equitable remedy of an injunction requires that the court also look to the equity doctrine labelled "laches."

Defendant does not pass off his services as those of plaintiff's.

### 3) *Dilution under Fla.Stat. 475.15(1977).*

Under this claim plaintiff must show that defendant's use of the word "Freedom" will lessen the uniqueness of plaintiff's registered mark, with the possible future result that a strong mark may become a weak one. *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445, 450 (5th Cir.1973). Again, while the inquiry here is broader than under the infringement claim, plaintiff has not shown that the advertising and commercial value of its mark has been drained off by defendant's use of "Freedom." *Community Federal Savings & Loan Association v. Orondorff,* 678 F.2d 1034.

### 4) *Defendant's Counterclaim.*

In the counterclaim, defendant asks for a declaratory judgment that it has a common law right to the service mark "Freedom Realty" and further asks that plaintiff be enjoined from using the word "Freedom" in association with its somewhat recently acquired real estate brokerage.

It is an axiom of service and trademark law that the first user of a mark owns it if conflicts arise with rival claimants. *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 415, 36 S.Ct. 357, 361, 60 L.Ed. 713 (1916). Once the basic rights in a mark are acquired upon its initial use, one may supplement or extend those rights by registration. E. Vandenburg, Trademark Law and Procedure, § 2.10, p. 54 (2nd ed. 1968). Although defendant was the first user of the mark Freedom Realty, he never obtained federal registration. Instead, the TTAB held that his mark was likely to be confused with plaintiff's various registered marks. As stated above, that decision is not binding here, and the Court finds it unpersuasive. Therefore, while not a registered mark under the Lanham Act, defendant still has the rights conferred by a common law trademark.

Plaintiff began using the mark "Freedom Savings" shortly before defendant opened his business. Plaintiff registered this mark, and the mark "Freedom" not long after defendant opened his doors. When two parties acquire common law rights in a mark in different areas and the prior user registers the mark, then the registered owner's rights can become incontestable. The other common-law owner does retain exclusive rights to the mark in areas where his use antedated the registration. *Wrist-Pocket Mfg. Co. v. Saunders Archery Co.,* 578 F.2d 727, 730 (8th Cir. 1978); *Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co.,* 477 F.2d 150, 157 (6th Cir.1970). Here, plaintiff had common-law rights in its various Freedom marks, as did defendant for his mark Freedom Realty. When plaintiff registered its marks, they became incontestable under 15 U.S.C. § 1065, *except* to the extent of defendant's rights in the geographic region created by his common-law mark. 15 U.S.C. § 1115(b)(5); *Wrist Pocket Mfg. Co. v. Saunders Archery Co., supra.* As a result, defendant's common law mark in Freedom Realty exists only in the area where he pursues his business, namely in Hillsborough County, Florida.

### 5) *Remedies*

Plaintiff is not entitled to any relief, having not prevailed on its three claims. Defendant is entitled to a declaratory judgment enabling him to use the term Freedom Realty in Hillsborough County, and plaintiff shall be enjoined from using the service mark Freedom Realty in Hillsborough County. While defendant requests an award of its attorney fees, this is not an "exceptional" case as required by 15 U.S.C. § 1117.

Judgment will be entered accordingly.